UNITED STATES of America,
Plaintiff–Appellee,

v.

Joseph W. ROSE, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Michael Allen PETERSON,
Defendant–Appellant.

Nos. 92–10742, 93–10001.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 11, 1994.

Decided April 1, 1994.

Jeffrey L. Staniels, Asst. Federal Public Defender, Sacramento, CA, for defendant-appellant Joseph Rose.

Dwight M. Samuel, Sacramento, CA, for defendant-appellant Michael Peterson.

Geoffrey Goodman, Asst. U.S. Atty., Sacramento, CA, for plaintiff-appellee.

Before: CHOY, SCHROEDER, and NOONAN, Circuit Judges.

CHOY, Circuit Judge.

In November 1992, Appellants Joseph W. Rose and Michael A. Peterson were each found guilty in separate jury trials in the United States District Court for the Eastern District of California of twelve counts of mail fraud, three counts of wire fraud, eight counts of money laundering and four counts of interstate transportation of stolen property under 18 U.S.C. §§ 1341, 1343, 1956(a)(1)(A)(i) and 2314. In addition, Peterson was convicted of one charge of obstruction of justice under 18 U.S.C. § 1503.

Peterson was sentenced to 240 months on each of the money laundering counts, 120 months on each of the interstate transportation counts and 60 months on each of the remaining counts, all sentences to be served concurrently. Rose was sentenced to 70 months on each of the money laundering counts and 60 months on each of the remaining counts, all sentences to be served concurrently. Having consolidated their appeals to consider their related contentions of error, we are asked to determine whether the district court erred in (1) increasing their offense levels by grouping funds involved in fraud and money laundering offenses under U.S.S.G. § 3D1.2(d); (2) increasing Peterson's offense level based on his role in the money laundering scheme as an organizer; and (3) declining to depart downward in sentencing Rose notwithstanding disparities in the sentencing schedules for the same conduct under the respective money laundering and fraud guidelines. In addition, the Government challenges the jurisdiction of this court to review what it characterizes as a discretionary decision by the district court not to grant Rose a downward departure. We affirm.

## I.

Appellants' convictions arose out of the fraudulent money lending and laundering activities of two companies organized and controlled by Peterson, Inter-coastal Financial Services, Inc. ("ICF"), a California corporation with headquarters in Sacramento, California and regional offices in Phoenix, Arizona and Newport Beach, California, and Pantecock and Brau Investments, Inc. ("PBI"), a California corporation. Contributing initial capital of $20,000, Peterson incorporated ICF in April, 1988 for the ostensible purpose of mortgage brokering.

In July, 1988 Peterson hired Rose to work for and co-manage ICF in various executive capacities, including senior vice president and chief financial officer. Almost simultaneously with Rose's hiring, Peterson purportedly transformed ICF into a direct commercial lender after failing to obtain a brokering license and being ordered by the California Department of Real Estate to cease and desist from further unlicensed mortgage brokering activities.

The essence of Peterson's scheme, facilitated by Rose, was to secure only nominally refundable advance fees from loan applicants in exchange for sham loan commitments. Driven by a tight lending market to seek alternative sources of capital, potential borrowers were baited with promises of highly competitive interest rates on direct loans from ICF and bogus promotional brochures listing projects completed with ICF funding.

To foster further the illusion of legitimacy and financial security, Appellants surrounded ICF with an elaborate corporate shell. In October 1988, with Rose's knowledge and cooperation, Peterson formed PBI with funds from ICF. Masquerading as the fictitious Messrs. Pantecock and Brau, Appellants misrepresented PBI to investors as ICF's separately managed and owned "deep pocket". Moreover, they reassured hesitant borrowers seeking references with letters signed by PBI's fabricated president, Anton Pantecock, or with spurious documents or other communications with ICF employees, including Rose, posing as PBI loan officers or account managers.

Promises of substantial offshore reserves, including a multi-million dollar warehouse line of credit, completed the illusion that ICF had money to lend. However, Peterson was

unable to prove that ICF could or did draw upon this line of credit, and the Government continued at trial to dispute the existence of any such resources.

Lured by this corporate facade, interested borrowers would then sign a standard form loan commitment letter provided by Appellants, tender a "lock-in" deposit of $5,000, and pay a much larger "commitment fee". In most cases borrowers were assured that the deposit and commitment fee were refundable and would be segregated in a trust account pending the closing of the loan. In the meantime ICF would generate padded billing reports for the processing of the would-be borrower's application. Although Peterson claimed in a few instances to have brokered a loan for applicants from a third party, notwithstanding the cease and desist order against further brokering and his lack of a broker's license, ICF never gave a loan or refund to any of the victims named in the indictment.[1]

Contrary to their usual representations to applicants, Appellants would then deposit an applicant's advance fee only temporarily into a trust fund before transferring the fee the same day or within a few days to one of several general operating accounts drawn on by ICF, PBI and other Peterson-owned entities. During the period covered by the indictment, approximately $3.5 million dollars flowed into these accounts, as well as two million dollars in inter-account transfers not taken into account for sentencing purposes. Rose assisted Peterson at this stage by depositing incoming checks, transferring funds between accounts and, on Peterson's instruction, disbursing funds to accounts payable. Peterson admitted that a majority of the $3.5 million received by ICF came from loan application and commitment fees.

Ignoring the daily complaints of dissatisfied or concerned clients, Peterson then spent these monies in their entirety on the operating costs of PBI and ICF, which primarily consisted of accountants' fees of at least $734,000 and his own salary in excess of $100,000 per year, as well as overhead, phoney solicitation materials, and payroll for several employees, including Rose's ending salary of $96,000.

As the specified closing date for a loan approached, Rose and Peterson would temporize by returning loan documentation on the pretense that corrections were needed or by attempting to extend the funding date unilaterally. Once the closing date passed without ICF having performed, Appellants would stall further by claiming that documentation delays had arisen, that the borrower owed additional processing or commitment fees, or that the borrower had failed to perform some concocted, minor or previously waived contractual obligation.

To appease disgruntled applicants, Appellants would also promise to seek another lender in ICF's stead or claim to have assigned the commitments, resulting in additional fees but rarely, if ever, in a third party loan. The parties disputed the extent to which such third party funding occurred, the significance of its occurrence, and the degree to which the sentencing report failed to deduct resulting "legitimate" fees from the value of funds laundered.

The record substantially contradicted Peterson's contention that ICF was a conduit for even some legitimate business. Behind the elaborate corporate veil, Peterson instructed at least one employee that his job was to ensure that loans were not funded. On a few occasions Peterson even emphasized to his employees that his interest was expressly to generate only the appearance of being willing and able to provide loans. In his defense Rose professed a more categorical belief that ICF was an entirely legitimate business. However, Rose's admission to his administrative assistant that "there are no funds" at ICF for commercial lending suggested that this profession was disingenuous. Also at odds with this profession was Rose's testimony before the grand jury, as well as a comment to a co-worker, that his salary was instrumental in his decision to continue working for ICF, despite its shady dealings, until the closing of its Sacramento office in January 1991.

---

1. One persistent individual not named as a count victim obtained a partial refund after uncovering evidence of fraud and threatening to contact the FBI.

Appellants were indicted on June 6, 1991. On the Government's motion, six counts were dismissed from the original 34 count indictment and the jury was given a renumbered superseding indictment. Peterson received an additional count for obstruction of justice when he inadequately responded to the district court's order that he comply with four subpoenas for business documents. After the jury convicted Appellants on all charges, presentence reports were submitted to the district court with recommendations that Rose and Peterson receive sentences of 96 and 240 months respectively.

The presentence report recommended a four-level increase for Peterson's role in the offense as "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive" under U.S.S.G. § 3B1.1(a). The report observed that Peterson supervised a criminally responsible party (viz., Rose) and in his extensive corporate network employed 60 persons who, knowingly or unknowingly, assisted him in the perpetration of fraud and money laundering. Peterson did not object to the four-level increase prior to this appeal.

The presentence report also recommended a six-level increase for the money laundering offenses for each of the defendants because the "value of the funds" involved exceeded two million dollars for purposes of the graduated sentence enhancement scale set forth in U.S.S.G. § 2S1.1(b)(2). The probation officer calculated the value of funds laundered on the basis of testimony (i) that ICF and PBI took in more than three million dollars; and (ii) that virtually all of this sum consisted of commitment fees obtained by fraud and then reinvested to fund further illegal activity, in keeping with the definition of money laundering under 18 U.S.C. § 1956(a)(1)(A)(i).

Both Rose and Peterson objected to this aspect of the sentencing report. Relying chiefly on recollection, Peterson contended that $404,767.50 should be deducted to account for applicants who ultimately obtained a loan or refund. The Government countered by submitting to the probation officer a proposed methodology for calculating the amount laundered and an incomplete sched-

ule of victims and deposits organized by source.

Under this methodology the Government arrived at an amount for sentencing purposes of $3.0 million for Peterson by (i) totalling the amounts deposited into ICF and PBI accounts between April, 1988, the commencement date of the illegal scheme set forth in the indictment, and January, 1991, the date of Peterson's indictment; (ii) deducting approximately $250,000 in income from Peterson-owned entities other than PBI and ICF; and (iii) assuming that all remaining monies were taken by fraud with the intent to promote further unlawful activity, thus constituting laundered funds under 18 U.S.C. § 1956(a)(1)(A)(i). In accordance with the Government's methodology, the probation officer calculated the smaller amount of $2.5 million for Rose in the sentencing report by ignoring funds taken in by ICF and PBI before January, 1989, the date of the earliest offense for which he was convicted.

After Appellants completed their arguments at the sentencing hearings, the district court accepted the probation officer's recommended sentence for Peterson and denied Rose a downward departure for acceptance of responsibility. However, accepting Rose's contention that he was a minor participant in the money laundering, the court reduced his sentence from 96 to 70 months.

## II.

### A.

Rose and Peterson do not appeal their eight-count convictions under 18 U.S.C. § 1956 for depositing money obtained by fraud with the intent of promoting an unlawful scheme. Moreover, they do not contest that the eight counts of conviction for money laundering involved approximately $275,000 and must be grouped together under U.S.S.G. § 3D1.2(d).

Rather, they object that the district court inflated the value of funds laundered by (i) improperly aggregating funds involved in the fifteen mail and wire fraud counts, as well as in uncharged conduct and (ii) failing to deduct reimbursements to customers, lawful intercompany transfers and fees earned legiti-

mately through ICF or other Peterson-owned companies. Therefore, they assert, the six-level increase ·in their respective offense levels constituted reversible error and their cases must be remanded for resentencing. We disagree. Because the value of funds involved in the fraud offenses were duplicative of the funds involved in money laundering offenses, the district court did not need to combine the offenses to obtain a figure in excess of $2·million.

■ We review de novo a district court's legal interpretation of the United States Sentencing Guidelines. *United States v. Hahn*, 960 F.2d 903, 907 (9th Cir.1992). A district court's finding that "certain extraneous conduct is nevertheless relevant for sentencing purposes" is reviewed for clear error. *Id.* at 910 (citing *United States v. Motz*, 936 F.2d 1021, 1026 (9th Cir.1991)). We accept a district court's findings of fact unless clearly erroneous. *United States v. Fine*, 975 F.2d 596, 599 (9th Cir.1992) (*en banc*).

■ Contrary to Appellants' contention that the sentencing court may not include fraud offenses or offenses outside the indictment in the calculation of "value of funds" laundered, the Sentencing Guidelines require rather than prohibit consideration of conduct beyond the counts on which a defendant was convicted. U.S.S.G. § 1B1.3(a)(2) directs the sentencing court to consider " 'all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction.' " *Fine*, 975 F.2d at 599; *see also, United States v. Johnson*, 971 F.2d 562, 576 n. 10 (10th Cir.1992) (finding that "funds associated with uncharged instances of money laundering can be added in to determine the offense level under § 2S1.1 if those acts are within the scope of relevant conduct under § 1B1.3(a)(2).").

Similarity, regularity and temporal proximity are the bases by which we delineate the contours of relevant conduct. *Hahn*, 960 F.2d at 910. As to the first factor, similarity, Peterson and Rose orchestrated the stratagem underlying the ·fraud counts, the charged money laundering counts, and the uncharged acts of money laundering by means of the same *modus operandi* and

through the common vehicle of the ICF corporate group. With regard to the second factor, regularity, the five-month gap between defendant's ·charged and "relevant" conduct deemed dispositive in *Hahn* has no equivalent in the instant case—the quarterly schedules attached to the sentencing report indicate that during the relevant periods Appellants routinely deposited commitment fees obtained through· the ongoing fraudulent activities of PBI and ICF.

As to the third factor, temporal proximity, the indictment and the conduct underlying Appellants' respective convictions and sentences were limited to the activities .of ICF and PBI between April, 1988 and January, 1991, or in Rose's case, between December, 1988 and January, 1991. Correspondingly, the uncharged money laundering documented in the sentencing report and reflected in their sentences occurred within these same periods. In addition, the fifteen mail and wire fraud counts stemmed simultaneously from wire transfers completed and letters and loan applications mailed on behalf of ICF or PBI between January 25, 1989 and July 30, 1990. In contrast to *Hahn*, the record thus demonstrates the presence of these three factors sufficiently to establish that the district court took only "relevant conduct" into account at sentencing.

■ Appellants further contend that *United States v. Taylor*, 984 F.2d 298 (9th Cir. 1993), precludes grouping funds involved in the wire fraud and laundering offenses under U.S.S.G. § 3D1.2(d), regardless of whether the underlying activities constituted relevant conduct. In *Taylor* we followed the holding of the Tenth Circuit in *Johnson*, 971 F.2d at 576, that "grouping under section 3D1.2(d) is not appropriate when the guidelines measure harm differently." *Taylor*, 984 F.2d at 303. Agreeing with the *Johnson* court that "the guidelines for wire fraud and money laundering measure harm differently," *Taylor*, 984 F.2d at 576, with the former measuring individual loss and the latter tallying funds attributable to an illegal scheme, we vacated the appellant's sentence and remanded for resentencing based only on the wire fraud count.

Close examination of *Taylor* and *Johnson* reveals factual distinctions supporting the district court's calculation of the value of funds underlying the six-level enhancement of Appellants' sentences. Most tellingly, the district court's calculation of value of funds in the instant case did not in fact take into account any monies other than those embraced by either charged or uncharged counts of money laundering, as to which grouping is clearly appropriate under U.S.S.G. § 2S1.1, the money laundering guideline. *See Johnson*, 971 F.2d at 576, n. 10 (noting that "in determining the 'value of the funds' under § 2S1.1, the district court is not necessarily limited only to the funds identified in the counts of conviction"). Whereas in *Taylor* the monies involved in the charge of conviction and related (and ultimately dismissed) charges merely overlapped and were thus not interchangeable, in the instant case these amounts were duplicative.[2]

*Johnson* is distinguishable on similar grounds. *Johnson* involved a defendant who masterminded a "peso scheme" in which he convinced his victims to invest a total of $5.5 million in pursuit of contrived, initially exceptional rates of return. 971 F.2d at 562. Having converted $1.8 million of this sum into real estate, liquid assets and consumer goods and baited investors with $2.4 million in wire-transferred "profits", Johnson was convicted of two counts of money laundering under 18 U.S.C. § 1956 and multiple counts of wire fraud under 18 U.S.C. § 1957. *Id.* at 565–67.

Deeming the wire fraud "relevant conduct" under U.S.S.G. § 1B1.3, the district court grouped with the laundered monies the much larger sum of approximately $20 million, the amount illegally wired back and forth or converted into cashier's checks over the course of the peso scheme. *Id.* at 576. The Tenth Circuit affirmed Johnson's conviction in part but reversed his sentence on the basis that the different measures of harm under 18 U.S.C. §§ 1956 and 1957 preclude grouping under U.S.S.G. § 3D1.2(d). Insofar as only partial identity existed between the funds laundered and the monies wired in furtherance of Johnson's scheme, the Government could not recharacterize all the latter funds as the former to take advantage of the steeper sentencing schedule for money laundering under U.S.S.G. § 2S1.1.

Unlike the amounts at issue in *Johnson*, the monies subject to the wire fraud counts in the instant case were a mere subset of, if not co-extensive with, the sums involved in charged and uncharged counts of money laundering. Given the Government's unrefuted contention that ICF and PBI spent all fraudulently obtained monies in furtherance of Appellants' illegal venture,[3] all monies deposited into ICF and PBI accounts thus satisfied the definition of laundered funds under 18 U.S.C. § 1956(a)(1)(A)(i). That is, although Rose and Peterson were convicted on money laundering counts involving only around $275,000, designation of uncharged money laundering counts as relevant conduct

---

**2.** In *Taylor*, the district court grouped amounts involved in two dismissed charges for money laundering and wire fraud with amounts involved in the charge of conviction for a monetary transaction in violation of 18 U.S.C. §§ 1957 and 982. 984 F.2d at 299. Remanding for resentencing, we directed the district court to disregard amounts involved in the wire fraud count because the monetary transaction count, with its different measure of harm, was related but not "relevant" conduct under the Sentencing Guidelines. *Id.* at 303.

Grouping was impermissible in *Taylor* because, whereas all the monies illegally transferred by Taylor in furtherance of the charge of conviction had been obtained by wire fraud, not all the money unlawfully wired to Taylor at the outset of the scheme became subject to the additional taint of the subsequent transfer for which the defendant was convicted. Insofar as the sentencing guidelines for the two counts posited

different measures of harm or loss, the additional sum involved in the dismissed count could only have constituted "relevant conduct" if Taylor had ultimately transferred this amount and thereby given rise to a charged or uncharged monetary transaction count. In contrast, in the instant case, the district court found that all monies fraudulently obtained were also illegally laundered or wired.

**3.** In overruling Appellants' objections to the presentence report before sentencing, the district court accepted the Government's position that "virtually all monies which came into ICF and PBI, approximately three million dollars, were obtained by fraud, and that they were deposited with the intent to promote the carrying on of the fraudulent scheme." *See United States v. Rigby*, 896 F.2d 392 (9th Cir.1990).

permits the "value of funds" for sentencing purposes to encompass virtually all of the non-deducted funds deposited into PBI and ICF general operating accounts during Appellants' respective indictment periods and thus to exceed $2 million for each of them, regardless of whether such monies were also subject to the wire fraud counts.

Peterson's second, related contention of error, that the district court failed to deduct legitimately earned fees from the value of funds laundered, rests on unsubstantiated factual assertions. Contrary to Peterson's assertion that some applicants received funding through ICF, the record substantially demonstrated that ICF lacked both the intention and the ability to make good on promises of direct loans or refunds. In rebuttal to Peterson's objection to the presentence report, the Government submitted memoranda of interview and complaint forms establishing that in each instance cited by Peterson as legitimate business activity Peterson misrepresented ICF as a willing and able direct lender and thereby defrauded the loan applicant. Moreover, far from remedying this deficiency in his case before the district court, the summary in Peterson's brief of the histories of such individuals' dealings with ICF further undermines his assertion that ICF legitimately earned some deductible fees, insofar as he concedes that the loans promised to these applicants failed to close, with one possible and inconsequential exception, in all such instances.[4]

Having only recharacterized monies wired as funds laundered, the sentencing judge did not, erroneously or otherwise, aggregate amounts embraced by the fraud charges with the value of funds laundered. Nor did the district court clearly err in declining to deduct allegedly legitimate fees. Therefore, we affirm the district court's finding that the involvement of funds in excess of two million dollars mandated a six-level increase in Ap-

pellants' offense levels under U.S.S.G. § 2S1.1B(b)(2)(G).

## B.

Peterson's third contention of error is that insufficient evidence of his role as an organizer of PBI and ICF supported the four-level increase in his offense level under U.S.S.G. § 3B1.1(a). This guideline authorizes a four-level enhancement if (i) the defendant was "an organizer or leader of a criminal activity" (ii) "that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). We review the district court's determination that a defendant was an organizer under this guideline for plain error since Peterson failed to object at sentencing. *See Taylor*, 984 F.2d at 302. Under the plain error rule we have discretion to reverse only if we find a clear error prejudicing defendant's substantial rights so as to "seriously affect the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, — U.S. —, —, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993).

The factors determining whether a person is a leader or organizer for sentencing purposes include "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning and organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, n. 4. This inquiry focuses on all aspects of relevant conduct and not merely the defendant's role in the counts of conviction. *United States v. Scarano*, 975 F.2d 580, 587 (9th Cir.1982).

Peterson's overarching organizational and leadership role squarely satisfied this first prong of U.S.S.G. § 3B1.1(a). The rec-

---

4. In any event Peterson did not demonstrate that the district court prejudicially erred in overlooking legitimately earned fees insofar as he failed to present evidence indicating that such fees were likely to have exceeded $1 million, the minimum deduction that would have dictated a lower increase in Peterson's offense level under the graduated sentence enhancement scale set

forth under U.S.S.G. § 2S1.1(b)(2)(G). Specifying a figure falling considerably short of this sum, Peterson claimed in his objection to the presentence report to be entitled to a deduction for legitimate lending activities of $404,767.50, plus unspecified commissions on aggregated loans of $350,000.

ord established that Peterson was the final decision-maker in the corporate group, received the largest compensation, caused the group to be formed, masterminded its ruse, recruited accomplices such as Rose, and was unfettered by a board of directors, minority shareholders or other dilution of control.

The second prong, relating to the magnitude of the criminal enterprise, was also satisfied in view of the extent to which Peterson's scheme involved other knowing or unwitting participants. A "participant" under Section 3B1.1(a) must be criminally responsible but need not have been convicted. U.S.S.G. § 3B1.1(a), n. 1. In addition to Peterson and Rose, at least three of the other 60 individuals employed by Peterson appear to have been sufficiently involved in collecting and depositing defrauded applicants' checks to be "criminally responsible".

However, the second prong's "otherwise extensive" subprong under Section 3B1.1(a) obviates further inquiry into the number of "participants". Whether criminal activity is "otherwise extensive" depends on such factors as (i) the number of knowing participants and unwitting outsiders; *United States v. Mullins,* 992 F.2d 1472, 1479 (9th Cir.1993) (affirming four-level upward adjustment where defendant enlisted the help of at least three participants and many innocent outsiders); (ii) the number of victims; *United States v. Stouffer,* 986 F.2d 916, 927 (5th Cir.1993) (finding not clearly erroneous the district court's finding that activity involving over 2,000 investors and $11 million in fraud-

ulently obtained funds was "otherwise extensive"); and (iii) the amount of money fraudulently obtained or laundered; *United States v. Allibhai,* 939 F.2d 244, 252–53 (5th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 967, 117 L.Ed.2d 133 (1992) (upholding finding of leadership role in money laundering scheme involving one million dollars and, in addition to four participants, the "unknowing service of many outsiders").

Even when limited to the indictment period, Peterson's scheme involved approximately $3 million, sixty knowing or unwitting employees or outside accountants of ICF or its subsidiaries, an untold but no doubt considerable number of bank employees and other outsiders, and scores of duped investors.[5] Therefore, the district court's four-level enhancement of Peterson's sentence as the organizer of "otherwise extensive" criminal activity was not clearly erroneous.

### C.

■ Rose's final contention of error is that the district court committed reversible error in refusing to grant a downward departure to minimize the sentencing disparity for the identical conduct underlying the wire fraud counts and, under U.S.S.G. § 2S1.1, the more harshly punishable money laundering charges of conviction on which his sentence was based. We disagree. Rose's motion failed to state an adequate legal basis for departure.[6]

---

**5.** Although considerable evidence indicated that Peterson fraudulently obtained thousands of dollars through ICF before April, 1988 and even after his indictment in January, 1991, the presentence report's calculation of the value of funds laundered did not take such amounts into account.

**6.** Addressing Rose's motion for downward departure, the district court stated, "I don't see any basis for it but I will hear you." Characterizing the Guideline's purpose as punitive, the district court then dismissed the contention of Rose's attorney that a sentence beyond thirty months would provide little additional rehabilitative or deterrent value. In a later colloquy with the foreperson of the jury, the court answered the jury's written request for comparatively lenient sentencing of Rose with the comment that "I don't have any power to do that under this system of law that we operate." While this state-

ment correctly pointed out that a juror's request for lenient sentencing is not a sufficient basis upon which to justify a departure, these and other of the judge's comments in the record do not alone establish that the judge believed more categorically that he either possessed or lacked authority to depart.

Nonetheless, the Government is correct in pointing out that we have consistently upheld denials of departure motions framed in language similar to that used by the district court. *See, e.g., U.S. v. Belden,* 957 F.2d 671, 676 (9th Cir. 1992) (declining to review where district court found "no basis for departure"); *United States v. Robinson,* 958 F.2d 268, 272 (9th Cir.1992) (deeming denial of motion unreviewable where district court found downward departure "not warranted"); *United States v. Koenig,* 952 F.2d 267, 273–74 (9th Cir.1991) (finding discretionary refusal to depart where district court that motion

A discretionary refusal to depart downward is not subject to appellate review. *United States v. Mejia,* 953 F.2d 461, 464 (9th Cir.1981). Where the district court indicates that it would have departed had it believed the legal authority to be present, the sentencing judge's refusal to depart on the basis that the Sentencing Guidelines preclude departure gives rise to a question of law that is reviewed de novo. *United States v. Belden,* 957 F.2d at 676.

The sentencing judge may lay the foundation for a departure under 18 U.S.C. § 3553(b) by identifying a mitigating or aggravating circumstance not adequately taken into account in the formulation of the Sentencing Guidelines. *United States v. Lira–Barraza,* 941 F.2d 745, 746 (9th Cir.1991). Rose contends that the disparity in the severity of fraud and money laundering guidelines was an oversight by the Sentencing Commission giving rise to a mitigating circumstance under Section 3553(b).

Contrary to this contention, the sentencing disparity complained of was not merely foreseen but also intended under U.S.S.G. § 2S1.1 and was resolved in favor of the harsher sentence under U.S.S.G. § 3D1.3. Moreover, the commentary to the money laundering guideline, U.S.S.G. § 2S1.1, notes that the Sentencing Commission drafted this guideline to establish a "higher base offense level ... if the defendant is convicted under 18 U.S.C. 1956(a)(1)(A)," and thus to provide for "substantial punishment" for "defendants who encouraged or facilitated the commission of further crimes." Discerning in the sentencing disparity no mitigating oversight, we affirm the district court's denial of Rose's departure motion.

**AFFIRMED.**

did not "have a basis"). However, because Rose failed to identify a mitigating circumstance on which departure could be premised under 18 U.S.C. § 3553(b), we decline to disentangle the consequently non-dispositive issue of reviewability.