UNITED STATES of America, Plaintiff–Appellee,

v.

Michael Eugene SAVAGE, Defendant–Appellant.

No. 93–10667.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 12, 1994.

Decided Oct. 13, 1995.

George C. Boisseau, Santa Rosa, California, for defendant-appellant.

Sandra L. Teters, Assistant United States Attorney, San Francisco, California, for plaintiff-appellee.

Before: TANG *, SCHROEDER, and REINHARDT, Circuit Judges.

TANG, Senior Circuit Judge:

Michael Savage appeals his judgment of conviction and sentence following a jury trial. Savage defrauded people of over $6 million by claiming that if they sent him $5000, he could obtain foreign loans and eventually pay each investor $10 million. Savage was convicted of mail and wire fraud, international money laundering, transferring criminally derived proceeds, and several other counts not at issue on appeal. Savage's appeal focuses solely on his convictions and sentence under 18 U.S.C. § 1956, international money laundering, and 18 U.S.C. § 1957, transfer of criminally derived proceeds. We have jurisdiction, and we affirm the judgment of conviction and the sentence.

From mid–1986 through mid–1991, Michael Savage defrauded investors by offering them the opportunity to participate in the "Savage Program," an investment program that promised a return of $10 million for a $5000 fee. In the "funding agreement," Savage provided the following explanation of the program. For each $5000 "unit" an investor purchased, Savage would negotiate an $80 million loan from unidentified foreign "principals" who wished to invest their vast wealth in the United States and Europe. Savage would invest $70 million of each loan in U.S. and European securities and "currency arbi-

* Judge Tang authored and circulated this opinion prior to his death.

trages" and the profits from these investments would pay off the entire $80 million loan, with interest. Savage would transfer the $10 million remaining from the original loan, called "funding," back to the investor along with a refund of the $5000 investment. Investors who wanted to leave the program could obtain a refund of their $5000 investment at any time. In a series of "solicitation drives," Savage collected over $6 million through this scheme. Savage and the people working with him spent virtually the entire amount.

As time passed, Savage sent investors frequent newsletters to explain why they had not yet received their "funding," and to discuss the necessity of bringing additional people into the program. The newsletters contained numerous false representations about the delays in "funding," typically relating unanticipated problems with the principals or banks. Savage also had contact with the "Task Force," a group of investors that initially formed to obtain information about why the program had not funded. Savage was vague about the details of the program and cautioned individual investors and Task Force members not to discuss the program with unauthorized persons.

Over the years, several other people helped Savage raise money, transfer it, and launder it. These people always worked under Savage's directions. In early 1987, Savage began working with Marlin Harris. First, Harris opened accounts at F & M bank in Kansas. Investors sent over $1 million to an account at this bank. Harris transferred the money to another account in the bank, and thereafter to accounts at the Royal Trust Bank in Vienna, Austria. The money in Austria was sent back to Savage's personal accounts in the United States, or was used directly to pay Savage's bills.

Dave Buck became involved in the Savage Program in late 1987. Buck also received over $2.5 million from investors, deposited into to the Wealth Information Network ("WIN") bank account at First Interstate

Bank in Walnut Creek, California. Buck transferred this money to Austria or used it to pay Savage's expenses. Jim Peterson collected nearly $1 million of investors' money at his Aguilar bank account and also sent that money to Austria or to Savage's personal accounts, beginning in late 1989. Pat Garner collected and transferred Savage Program investments through the "P & M trust" at Spring National Bank in Texas, beginning in late 1990. Most of these funds were sent to the account of an attorney who paid Savage's personal expenses.

Savage was arrested on July 26, 1991. A federal district court order in a civil action restrained transfer of Savage's personal property. Nonetheless, Savage pledged his property as security for a corporate surety bond with a bail bonding company. Further, in an attempt to derail the investigation, Savage submitted false documents about the Savage program to the United States Attorney's office.

Savage was charged in a 101–count first superseding indictment filed September 13, 1991. Jury trial for Savage and codefendants J. David Buck and Pat Garner began on March 9, 1993. On May 24, 1993, the jury found Savage guilty of the following:

(1) mail fraud, 18 U.S.C. § 1341, counts 1–13, 16, 18, 20–35, 37–45;

(2) wire fraud, 18 U.S.C. § 1343, counts 46–47, 50–69;

(3) money laundering by transferring funds to foreign bank accounts, 18 U.S.C. § 1956(a)(2)(A), (a)(2)(B)(i), counts 70, 72–74, 76–79;

(4) engaging in monetary transactions (here, wire transfers) in criminally derived property, 18 U.S.C. § 1957, counts 81–93.[1]

On October 8, 1993, Savage was sentenced to a 210–month prison term, five years of supervised released, and a $50 special assessment on each of the eighty-nine counts of conviction. Savage appeals the district

---

**1.** The jury also convicted Savage of: (1) making false statements in an application for a bank loan, 18 U.S.C. § 1014, counts 95–96; (2) submitting false tax returns, 26 U.S.C. § 7206, counts 98–99; (3) obstruction of justice by submitting false documents to the U.S. Attorney's office, 18 U.S.C. § 1505, count 100; and (4) making false statements in connection with bail proceedings, 18 U.S.C. § 1001, count 101. Savage does not appeal this portion of his conviction.

court's judgment of conviction under 18 U.S.C. §§ 1956, 1957, and the sentence imposed on that portion of the conviction.

## I. Duplicitous Counts

█ Savage argues that his convictions on the § 1956 counts, 70, 72–74, and 76–79, for international money laundering should be reversed because each of these counts was duplicitous, i.e. each count contained two distinct offenses. *See United States v. Aguilar,* 756 F.2d 1418, 1420 n. 2 (9th Cir.1985). Savage did not object to defects in the indictment before trial. Therefore, he has waived his right to raise an objection to the form of the indictment. *United States v. Gordon,* 844 F.2d 1397, 1400 (9th Cir.1988); Fed. R.Crim.P. 12(b)(2), (f).[2]

█ Savage argues that the jury instructions did not correct the deficiency. Although Savage did not object to the indictment, he could have objected to the jury instructions. *See Gordon,* 844 F.2d at 1400–01 and n. 1. However, Savage did not object to the jury instructions below and has therefore waived his right to raise the adequacy of jury instructions on appeal. *See United States v. Kessi,* 868 F.2d 1097, 1102 (9th Cir.1989); Fed.R.Crim.P. 30.[3]

█ Although Savage waived his right to raise the duplicity problem, we note that Savage has a right, under the Sixth Amendment, to a unanimous jury verdict. Duplicity raises the concern that Savage could have been convicted without a unanimous verdict

**2.** Fed.R.Crim.P. 12 provides in relevant part:
  (b) Pretrial Motions.... The following must be raised prior to trial:

  .  .  .  .  .
    (2) Defense and objections based on defects in the indictment

  .  .  .  .  .
  (f) Effect of Failure To Raise Defenses or Objections. Failure by a party to raise defenses or objections ... shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

**3.** Fed.R.Crim.P. 30 provides, in relevant part:
  No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict....

**4.** The instructions provided:

as to each offense contained in the counts at issue, in violation of the Sixth Amendment. *Aguilar,* 756 F.2d at 1420 n. 2. Because a substantial right is at issue, we review the jury instructions for plain error even though Savage failed to object to the instructions below. Fed.R.Crim.P. 52(b); *United States v. Anguiano,* 873 F.2d 1314, 1319 (9th Cir. 1989) (in case involving multiple conspiracies, failure to provide specific unanimity instruction is reviewed for plain error when the adequacy of the instructions was not raised during trial). When we review for plain error, we will reverse only if clear error prejudiced the defendant's substantial rights so as to affect seriously the fairness or integrity of the judicial proceedings. *United States v. Rose,* 20 F.3d 367, 373 (9th Cir. 1994).

Each of the § 1956 counts charges (1) the offense of transferring funds outside the United States with the intent to promote the underlying acts of mail and wire fraud, 18 U.S.C. § 1956(a)(2)(A)(i), and (2) the offense of transferring funds outside the United States to conceal or disguise the nature, the location, the source, the ownership or the control of the mail and wire fraud proceeds, 18 U.S.C. § 1956(a)(2)(B)(i). These counts do not raise the concern that the jury could have convicted Savage with less than a unanimous verdict. The jury instructions were not disjunctive. Rather, the instructions required the jury to find the elements of both offenses.[4]

  In order for a defendant to be found guilty of an illegal money transaction in any of the counts 70 through 79, the government must prove each of the following elements beyond a reasonable doubt for that count:
  First, the defendant transported money from a place inside the United States to a place outside the United States, or to a place inside the United States from a place outside the United States;
  Second, the defendant acted with intent to promote the carrying out of or the attempted carrying out of wire of mail fraud;
  Third, the defendant knew that the money represented the proceeds of wire or mail fraud; and
  Fourth, the defendant knew the transportation was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the money from the wire or mail fraud.

Our conclusion is consistent with the Seventh Circuit's analysis of the identical problem with respect to a charge brought under § 1956(a)(1), which, like § 1956(a)(2), has both a promotion subsection, § 1956(a)(1)(A)(i), and a concealment subsection, § 1956(a)(1)(B)(i). In *United States v. Jackson*, 935 F.2d 832, 842 (7th Cir.1991), the indictment and jury instructions interpreted § 1956(a)(1) as requiring the government to prove that the charged transactions were both intended to promote a continuing criminal enterprise and were designed to conceal the source of the funds. The Seventh Circuit concluded that combining the two offenses did not warrant reversal because the government had merely imposed an additional burden on itself. *Id.* This conclusion applies equally to Savage's case.

Savage argues that the jury could not have found him guilty of violating both §§ 1956(a)(2)(A) and 1956(a)(2)(B)(i) because the elements of each subsection are mutually exclusive. He claims that he could not transport money both (1) with the intent to promote mail or wire fraud and (2) with the knowledge that the transaction was designed to conceal the nature, source, ownership, location or control of proceeds of mail or wire fraud. We disagree. The circumstances in which a single transaction is designed for both purposes may be rare, but the two purposes are not so inconsistent as to be mutually exclusive.

## II. Sufficiency of the Evidence on 18 U.S.C. § 1956 Convictions

■ By moving for acquittal pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure, Savage preserved his right to appeal on the grounds of insufficient evidence. *United States v. Atkinson*, 990 F.2d 501, 502–503 (9th Cir.1993) (en banc). In reviewing sufficiency of the evidence claims, we review the record to determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* at 502 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

### A. Sufficiency of the evidence that the international money transfers were made with the intent to promote the mail and wire fraud.

■ In the combined § 1956 counts, 70, 72–74, and 76–79, the jury found Savage guilty of the conduct proscribed by 18 U.S.C. § 1956(a)(2)(A), under which the government was required to show that Savage did:

"transport[ ], transmit[ ], or transfer[ ] ... a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—(A) *with the intent to promote the carrying on of specified unlawful activity....*" (Emphasis added).

Here, the "specified unlawful activity" is the mail fraud in violation of 18 U.S.C. § 1341 and the wire fraud in violation of 18 U.S.C. § 1343. Savage claims that there is insufficient evidence that he intended to *promote* the mail and wire fraud by transferring funds overseas.

■ We agree with the analysis of the Tenth Circuit, which has concluded that circumstantial evidence of intent to promote a fraudulent scheme exists if the transfer lends an "aura of legitimacy" to the scheme. *United States v. Johnson*, 971 F.2d 562, 566 (10th Cir.1992). In *Johnson*, the Tenth Circuit determined that a defendant who laundered money by paying his mortgage with wire fraud proceeds had the intent to promote his fraudulent scheme. The defendant used an office in his home to carry out the scheme and his "aura of legitimacy" was bolstered in the mind of investors who saw his house. *Id.*

Counts 70 and 72–74 charge transfer of money from the United States to bank accounts in Austria. Looking at the evidence in the light most favorable to the prosecution, a rational jury could have concluded that Savage instructed people to transfer money to Austria to make the Savage program appear legitimate, thereby promoting further domestic mail and wire fraud. The success of the Savage program depended on the investors' belief that Savage could somehow utilize their $5,000 "investment" to obtain $80 million in loans from foreign "principals." Savage told investors that the $10 million in

"funding" was coming from these foreign principals. Everything Savage did to show that he had contacts with foreigners and expected money from them lent legitimacy to his scheme.

At trial, some of the parties involved in transferring money overseas explained how the transfers promoted the Savage program. Marlin Harris opened "trust accounts" in the Austrian bank to receive the "funding" from the foreign investors and transferred money from the U.S. to these accounts per Savage's instructions. [1341, 1407.] Harris testified that he transferred money from the U.S. to keep the trust accounts up to a certain standard and to pay for Savage program expenses. [1333.] Savage testified that money was transferred to "facilitate" the overseas transactions and pay for expenses. [24 RT 3734.] Savage told Dave Buck to transfer money from the United States to the Austrian accounts because the latter accounts were going to be used for the transactions. [3843.]

Investors were aware that Savage, through the people reporting to him, transferred money to open and maintain bank accounts in Austria. Savage could have transferred the money with the intent of fostering investors' belief that Savage's foreign contacts would send their "loans" to these accounts. The transfers made the program appear legitimate and increased the confidence of people who had spent money to join the program. Investors' confidence reduced the possibility that they would ask for a refund and increased the possibility that they would encourage others to join the program.

Counts 76–79 involved transfer of money from Austrian bank accounts back to Savage in the United States. Looking at the evidence in a light most favorable to the prosecution, a rational juror could conclude that these money transfers provided Savage with resources to travel and continue contacting investors, thereby promoting the Savage program.

### B. Sufficiency of the evidence that the international money transfers involved "proceeds" of the domestic mail and wire fraud.

On the combined § 1956 counts, the jury also found Savage guilty of conduct proscribed by 18 U.S.C. § 1956(a)(2)(B)(i), under which the government was required to prove that Savage:

did transport[ ], transmit[ ] or transfer[ ] ... a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States— ... knowing that the monetary instrument or funds ... represent the *proceeds* of some form of unlawful activity and knowing that such transportation is designed ... to conceal or disguise the nature, the location, the source, the ownership, or the control of the *proceeds* of specified unlawful activity. (Emphasis added).

Savage argues that the international monetary transfers did not involve "proceeds of specified unlawful activity." Although characterized as an argument concerning sufficiency of the evidence, this argument requires that we begin by construing § 1956 to determine what is meant by "proceeds." Savage asserts that "proceeds" constitute funds from previous and completed criminal activity. Although the statute contains no definition of "proceeds," legislative history is consistent with Savage's position. Congress considered money laundering to be separate conduct occurring after completion of the underlying criminal offense. The Senate report indicates, "The growth of money laundering has been a corollary of the spread of profitable illegal enterprises. The criminals involved in these enterprises have devised complex schemes to disguise the illegal nature and true source of their income." S.Rep. No. 433, 99th Cong., 2d Sess. (1986). " [I]llegal drugs, gambling and vice generate $150 billion annually. It is readily apparent that criminals rely on laundering schemes to hide the identity and true source of these proceeds.'" *Id.* at 4 (quoting Senator Strom Thurmond).

The legislative history indicates that Congress passed the money laundering statutes to criminalize the means criminals use to cleanse their ill-gotten gains. We conclude that "proceeds" are funds obtained from prior, separate criminal activity. The Tenth Circuit has reached the same conclu-

sion: "Congress appears to have intended the money laundering statute to be a separate crime distinct from the underlying offense that generated the money to be laundered." *United States v. Edgmon,* 952 F.2d 1206, 1213 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992).

Savage further argues that the transferred money was not "proceeds" of the wire and mail fraud charged in counts 1–69, the "specified unlawful activity," because the mail and wire fraud were not complete until the money was transferred overseas and then back to the United States into Savage's personal account. Savage's argument fails. The predicate offenses of domestic mail fraud and wire fraud were complete before funds were transferred outside the United States. The mail fraud charges involved mail sent to promote the Savage program, such as newsletters and membership applications. None of these charges involved transfer of funds. All of the wire fraud charges involved transfer of money within the United States. Each act of mail and wire fraud was complete at the point at which Savage or someone acting under his direction mailed the promotional information or wired the money in the United States. The money that investors sent to the Savage program constitutes the "proceeds" of the mail fraud. The money wired domestically is the "proceeds" of the wire fraud. Ample evidence in the record indicates that the international money transfers involved the proceeds of these previous acts of mail and wire fraud.

## III. Did the transactions charged under 18 U.S.C. § 1957 involve "criminally derived property" from the mail or wire fraud?

■ In counts 81–93, the jury found Savage guilty of the conduct proscribed by 18 U.S.C. § 1957, which provides in relevant part, "Whoever ... knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is ... derived from specified unlawful activity shall be punished...." Savage's challenge to the sufficiency of the evidence supporting his convictions under § 1957 requires that we construe the definition of "criminally derived property." According to the statute, " 'crimi-

nally derived property' means any property constituting, or derived from, proceeds obtained from a criminal offense...." 18 U.S.C. § 1957(f)(2).

■ The legislative history setting forth Congressional concerns regarding money laundering is applicable to both § 1956 and to § 1957. Therefore, we conclude that "criminally derived property" under § 1957 is equivalent to "proceeds" under § 1956, i.e., funds obtained from prior, separate criminal activity. Our conclusion is consistent with the Tenth Circuit's conclusion that "criminally derived property" is the proceeds, from an underlying criminal offense, obtained by a defendant before the defendant engages in the monetary transaction prohibited by § 1957. *United States v. Johnson,* 971 F.2d at 569–70.

In *Johnson,* the defendant was charged with 28 counts of violating § 1957 based on twenty-eight separate wire transfers of funds from investors to the defendant's bank account. *Id.* at 567. The same wire transfers also constituted the underlying offense. The court reversed the judgment of conviction under § 1957 because the wire transfers did not involve "criminally derived property." The court reasoned that the defendant did not have proceeds of an underlying criminal offense until the defendant received the wire transfers from the investors. *Id.* at 569–70.

Savage claims the wire transfers that are the basis of his § 1957 convictions did not involve "criminally derived property," relying on the following quote from *Johnson,* 971 F.2d at 570:

> Section 1957 appears to be drafted to proscribe certain transactions in proceeds that have already been obtained by an individual from an underlying criminal offense. The defendant did not have possession of the funds nor were they at his disposal until the investors transferred them to him.

Savage claims that he did not have "possession" of the money when the wire transfers were sent because the money was not transferred out of his own personal account. Savage reads *Johnson* too narrowly. In *Johnson,* investors sent money directly to

Johnson's account. The funds did not constitute property "criminally derived" from mail and wire fraud until they were deposited. Similarly, the funds transferred in the § 1957 counts were criminally derived property at the time they were deposited in accounts under Savage's control. The funds were clearly at Savage's disposal at the time of deposit—the record indicates that the parties named on the accounts transferred the money at his request. It is irrelevant that the accounts were not in Savage's name.

## IV. Was Savage's sentence on the § 1956 and § 1957 offenses properly calculated?

██ Savage concedes he did not object to application of sentencing guidelines that he now argues are incorrect. We have held that failure to object constitutes a waiver of the right to appeal. *United States v. Hernandez–Rodriguez*, 975 F.2d 622, 628 (9th Cir. 1992). Nonetheless, we have also held that when a defendant fails to object, sentencing will be reviewed for plain error. *Id.* We proceed to review application of the guidelines in Savage's case for plain error.

### A. Base offense level for the § 1956 convictions.

██ The district court set a base offense level of 23 for the eight counts of conviction under § 1956. U.S.S.G. § 2S1.1(a)(1)–(2) sets a base offense level of 23 for convictions under § 1956(a)(2)(A) and a base offense level of 20 for convictions under § 1956(a)(2)(B). Savage argues he was convicted only of violating § 1956(a)(2)(B). However, as discussed above, Savage was convicted under counts combining the elements of § 1956(a)(2)(A) and § 1956(a)(2)(B). Because the guidelines establish the base offense level of 23 for the § 1956(a)(2)(A) violation, the district court's decision to apply the higher base offense level of 23 cannot be considered plain error.

### B. Organizer/manager adjustment for the § 1956 offenses.

██ The district court increased the base offense level for the § 1956 convictions by 4 levels under U.S.S.G. § 3B1.1(a), which provides for this increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The court stated:

> Again, for the adjustment for role in the offense, Mr. Savage was the organizer. He was the moving factor *behind the entire scheme.* There were more than five people involved in it that he used.

[Sentencing Transcript ("ST") at 57] (Emphasis added). These remarks indicate that the district court relied on Savage's role in the Savage program as a whole, rather than solely on his role in the international money laundering. Savage does not dispute that this enhancement was appropriately applied to increase the base level on the underlying mail and wire fraud convictions. However, he argues that it was improperly applied to increase the base level on the money laundering convictions.

The district court was applying the 1987 guidelines. Prior to the 1990 amendment to the § 3B1.1 introductory commentary, we indicated that adjustment for aggravating role should be based solely on the defendant's role in the offense of conviction. *United States v. Zweber*, 913 F.2d 705, 708 (9th Cir.1990). The 1990 amendment to the introductory commentary explains that the adjustment for role is based on all relevant conduct, as defined in U.S.S.G. § 1B1.3, and not solely on the defendant's role in the offense of conviction. After this 1990 commentary amendment came into effect, we concluded that the amendment clarified the relationship between § 1B1.3, governing relevant conduct, and § 3B1.1. *United States v. Lillard*, 929 F.2d 500, 503 (9th Cir.1991). We distinguished the discussion on § 3B1.1 in *Zweber* as dicta. *Lillard*, 929 F.2d at 503.

*Lillard* thus indicates that even in pre–1990 application of the guidelines, the adjustment for role could be based on the defendants' role in all "relevant conduct," which includes acts "committed or aided or abetted by the defendant" in preparation for the offense. U.S.S.G. § 1B1.3(a)(1). Savage's role in the entire mail and wire fraud scheme is relevant conduct for purposes of determining his aggravating role in money laundering. Thus, the district court did not err in considering his role in the "entire scheme."

The district court also correctly concluded that Savage orchestrated the efforts of well over five participants to perform the wire and mail fraud that provided the monetary proceeds laundered in violation of § 1956. "A 'participant' is a person who is criminally responsible for the offense, but need not have been convicted." Commentary note 1 to § 3B1.1(a). William Tankersley helped bring other people into the Savage program. [21 RT 3199] Pat Cross handled Savage program paperwork and phone calls from investors. [4 RT 229] Marlin Harris opened accounts in which investors deposited their money, and he transferred funds to bank accounts he opened for Savage in the Austrian bank. [12 RT 1299, 1304] Dave Buck performed a similar role. [12 RT 1464–66] Steve Fink and James Peterson arranged to utilize one of Peterson's accounts for deposit of Savage program funds. [11 RT 1161–65] Fink and Savage also instructed Peterson on when to wire funds from this account to other banks. [11 RT 1165–66] Pat Garner opened yet another account to receive and transfer Savage program funds. [14 RT 1790–1794]

### C. Adjustment to § 1956 conviction for laundering over $2 million

■ The district court found that the money laundered in violation of § 1956 totalled more than $2 million and therefore increased the base offense level for the § 1956 convictions by 6 levels. [ST 57] *See* U.S.S.G. § 2S1.1(b)(2)(G). Savage argues that total disbursement from the Royal Trust Bank accounts totalled $1,968,965, under $2 million, and therefore the base offense level should have been increased by 5 rather than 6. *See* U.S.S.G. § 2S1.1(b)(2)(F). Savage's argument fails. The figure Savage cites is not the total disbursement from Royal Trust Bank. Rather, the figure is the total amount deposited into Savage's MacGregor account at the Bank of America, Napa, California. [19 RT 2895, 2907] These deposits came from several sources. [19 RT 2896, 2898, 2900–2903] Thus, Savage provides no support for his claim that total disbursements from the Royal Trust Bank account were under $2 million.

■ 18 U.S.C. § 1956(a)(2) prohibits the transfer of funds either *out of* or into the

United States, if done to promote fraud or conceal the proceeds of unlawful activity. The sentencing adjustment for the value of funds transferred is based on "all acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). Such acts can include uncharged acts. *United States v. Rose,* 20 F.3d 367, 371 (9th Cir.1994). The United States Attorney asserts that evidence introduced at trial establishes transfers out of the United States totalling over $3 million and Savage does not dispute that figure. The record indicates that $1,230,000 was transferred out of the U.S. from the W.I.N. account, $240,000 from the Aguilar account, and at least $615,-000 from the F & M bank, for a total of $2,085,000. [19 RT 2857, 2873, 20 RT 3034] The six level increase was appropriate.

### D. Adjustment for § 1957 conviction for transferring over $6 million

■ Savage was convicted of thirteen counts of violating § 1957, governing transfers of criminally derived proceeds. The district court concluded that the wire transfers in violation of § 1957 totalled over $6 million, a figure equal to the total amount that Savage defrauded investors. The court increased the base offense level by 8. [ST 58–59] U.S.S.G. §§ 2S1.2(b)(2), 2S1.1(b)(2)(I). Savage argues that because the $6 million figure was the total amount that Savage obtained through the fraud, the increase under § 1957 improperly imposed extra punishment for the underlying criminal activity of mail and wire fraud.

We need not address this issue. The § 1956 convictions and the § 1957 convictions were grouped together to determine the offense level in the sentencing guidelines. [ST 54] *See* U.S.S.G. § 3D1.2(d). The § 1956 convictions resulted in an offense level of 35, while the § 1957 convictions resulted in an offense level of 33. ST 57, 59. The offense level for the group became 35, the higher of the two offense levels. [ST 59–60] *See* U.S.S.G. § 3D1.3(b). Thus, the offense level for the § 1957 convictions was not used to calculate the final sentence.

## V. Conclusion

The judgment of conviction and the sentence are AFFIRMED.