190 F.3d 1017 (9th Cir. 1999)
 UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
CARL R. HANLEY, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
RANDALL E. MOORE, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
WILLIAM B. SCOTT, JR., Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
JOHN WILLIAM FRY, Defendant-Appellant.
 No. 98-10010 No. 98-10011 No. 98-10012 No. 98-10294
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted August 9, 1999
Decided September 8, 1999
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 Anthony P. Sgro, Patti & Sgro, Las Vegas, Nevada; Curt Obront and Paul A. McKenna, McKenna & Obront, Coconut Grove, Florida; David J. Kramer, Novi, Michigan, for the defendants-appellants.
 Daniel S. Goodman, U.S. Department of Justice, Criminal Division, Appellate Section, Washington, D.C., for the plaintiff-appellee.
 Appeals from the United States District Court for the District of Nevada; Edward C. Reed, Jr., District Judge, Presiding. D.C. No. CR-95-00312-ECR.
 Before: John T. Noonan, David R. Thompson, and Susan P. Graber, Circuit Judges.
 GRABER, Circuit Judge:
 
 
 1
 In this consolidated appeal, defendants Carl R. Hanley, Randall E. Moore, William B. Scott, Jr., and John William Fry appeal from their convictions and sentences for wire fraud, conspiracy to commit wire fraud, and money laundering. Defendants' convictions stem from their operation of a fraudulent telemarketing enterprise, Legendary Concepts, Inc. We affirm.
 
 FACTUAL AND PROCEDURAL HISTORY
 I. FACTUAL HISTORY
 
 2
 Our recitation of facts is governed by the principle that the evidence introduced at trial must be viewed in the light most favorable to the government. See United States v. Lothian, 976 F.2d 1257, 1259 (9th Cir. 1992).
 
 
 3
 Defendants Hanley, Moore, and Scott were the owners and officers of Legendary Concepts, a telemarketing company located in Las Vegas, Nevada. Hanley was the President ofthe company and had primary responsibility over its sales force; Moore was the company's Secretary and oversaw its shipping department; and Scott was the company's Treasurer and was in charge of the company's financial matters. Although each owner had primary responsibility for a particular segment of the company, each owner was active in all aspects of the company's operations and management. Defendant Fry was a salesperson at Legendary Concepts, who trained other telemarketers and assisted them in completing sales.
 
 
 4
 Beginning in February of 1993, Defendants embarked on a scheme to defraud individuals throughout the United States. Legendary Concepts' sales personnel called people, who previously had responded to direct mail offerings, to persuade them to buy exorbitantly overpriced products, such as cosmetics, cleaning supplies, fire safety kits, Fisher "space" pens, and "Say no to drugs" promotional goods. The price of those goods far exceeded what Legendary Concepts paid for them. For example, the "Say no to drugs" product package, which included such low-cost items as Frisbees, baseball caps, rulers, calculators, and desk clocks, was sold by Legendary Concepts for between $1,299 and $3,999. The Fisher "space" pens, which Legendary Concepts had acquired for $7.70 each, sold for $159.95. From March 1993 to November 1995, Legendary Concepts took in a total of $13.1 million from its customers. During that same period, the company spent only $53,000 on prizes for its contest "winners."
 
 
 5
 Legendary Concepts' telemarketers used a sales pitch designed to convince customers that they had to buy the company's products to win a "valuable" prize. In one promotion, Legendary Concepts "guaranteed" customers that they would win one of five "valuable" prizes. The prizes included $3,000 in cash, a Whirlpool appliance package, a "limited edition artwork," $5,000 in cash, and a brand new Ford Taurus. Telemarketers told each customer that the prize would be selected randomly by a computer. In reality, the customers would always "win" the least valuable award, or a "gimme gift." In the promotion described above, the "gimme gift " was the "limited edition artwork," a framed lithograph by Jane Wooster Scott for which Legendary Concepts had paid less than $75 apiece. Other "gimme gifts" included poor-quality stereos, home video systems, and watches, none of which compared in value to the other prizes offered in the promotion.
 
 
 6
 Once a year, Legendary Concepts awarded to certain customers the "real" prizes, such as the cash awards or the Ford Taurus, but not by random computer selection. Instead, either an employee of the company or the owners themselves picked the winner, who was always a customer who had purchased a substantial amount from the company.
 
 
 7
 Legendary Concepts' standard sales pitch was deceptive in three ways. First, the sales pitch misrepresented the method by which Legendary Concepts selected "prizes" and "winners." Second, it led customers to believe that they had to buy the company's products in order to receive a "valuable" prize. Although the sales pitch included an initial disclaimer notifying customers that they were "under no obligation to make a purchase," a number of customers testified that Legendary Concepts' sales personnel had told them, or had led them to believe, that they had to buy products to win a prize or that theirodds of winning a prize would improve if they made a purchase.
 
 
 8
 Third, the sales pitch was deceptive because, as one former employee testified, it was "designed to make the customer think that they're going to receive something better than what they're going to receive." In other words, the sales pitch led customers to believe that the "valuable" prize that they had won would be worth more than the amount of money that the customer paid for the products. As noted, this impression was not true.
 
 II. PROCEDURAL HISTORY
 
 9
 In March of 1996, a grand jury returned a 39-count indictment against Defendants and others. Count 1 of the indictment alleged that, from February 22, 1993, to September 14, 1995, each Defendant had engaged in a conspiracy to commit wire fraud, in violation of 18 U.S.C. S 371. Counts 2 through 22 charged Hanley, Moore, and Scott with 21 instances of wire fraud, in violation of 18 U.S.C. S 1343; Fry was charged in three of those counts (Counts 5, 11, and 22). The remaining counts of the indictment charged Hanley, Moore, and Scott with 17 instances of laundering of monetary instruments, in violation of 18 U.S.C. S 1957.
 
 
 10
 After a month-long trial, the jury returned guilty verdicts against all Defendants on all counts. The district court sentenced Hanley, Moore, and Scott each to 121 months' imprisonment and defendant Fry to 46 months' imprisonment. Defendants bring this timely appeal.
 
 DISCUSSION
 I. THE WIRE-FRAUD COUNTS
 
 11
 Defendants first claim that there was insufficient evidence to support their convictions for wire fraud and conspiracy to commit wire fraud. In advancing that argument, Defendants also assert that the district court committed several legalerrors in interpreting the substantive law relating to proof of wire fraud.
 
 
 12
 "We review the sufficiency of the evidence by viewing it in the light most favorable to the prosecution and asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Blitz, 151 F.3d 1002, 1006 (9th Cir.), cert. denied sub nom., Marie v. United States, 119 S. Ct. 567 (1998) (internal quotation marks and citation omitted) (emphasis in original). We review de novo the district court's interpretation of criminal statutes. See United States v. Mirabella, 73 F.3d 1508, 1515 (9th Cir. 1996) (reviewing de novo whether a money-laundering statute requires "tracing" to prove a violation).
 
 A. Requirements to Prove Wire Fraud
 
 13
 First, each Defendant (except Fry) asserts that his convictions cannot stand as a matter of law, because he personally did not make any fraudulent statements to any customer over the wires. Defendants further contend that they cannot be held vicariously liable for the fraudulent statements of the company's telemarketers. Defendants' arguments are foreclosed by the well-established law of this circuit.
 
 
 14
 This court has made clear that, in cases involving mail and wire fraud, "[t]he defendant need not personally have mailed the letter or made the telephone call; the offense may be established where one acts with the knowledge that the prohibited actions will follow in the ordinary course of business or where the prohibited acts can reasonably be foreseen." Lothian, 976 F.2d at 1262. We have explained further that coschemers in a scheme to defraud may be held vicariously liable for the acts of their co-schemers. See id. "Because an essential element of [mail and wire fraud] is a fraudulent scheme, [those offenses] are treated like conspiracy in several respects . . . . Like co-conspirators, `knowing participants in the scheme are legally liable' for their co-schemers' use of the mails or wires." Id. at 1262-63 (citation and internal quotation marks omitted). Thus, contrary to their assertions, Defendantscannot escape liability merely because they themselves did not pick up the telephone and make fraudulent statements to Legendary Concepts' customers.
 
 
 15
 Second, Defendants argue that their convictions must be reversed, because the government failed to prove that they had devised a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension. See Pelletier v. Zweifel, 921 F.2d 1465, 1498-99 (11th Cir. 1991) (stating that rule). However, the law of this circuit does not require such a showing. In this circuit, "[i]t is immaterial whether only the most gullible would have been deceived" by thedefendants' scheme. Lemon v. United States, 278 F.2d 369, 373 (9th Cir. 1960). In Lemon, this court observed that the wire-fraud statute "protects the naive as well as the worldlywise, and the former are more in need of protection than the latter. As a matter of fact, . . . the lack of guile on the part of those solicited may itself point with persuasion to the fraudulent character of the artifice." Id. (citations and internal quotation marks omitted).[1] Although Defendants ask us to revisit Lemon, we may not do so, because no intervening Supreme Court decision has undermined the precedential value of that authority. See United States v. Gay, 967 F.2d 2, 7 (9th Cir. 1992) ("As a general rule, one three-judge panel of this court cannot reconsider or overrule the decision of a prior panel. An exception to this rule arises when an intervening Supreme Court decision undermines an existing precedent of the Ninth Circuit, and both cases are closely on point.") (citations and internal quotation marks omitted). Defendants' second argument thus fails.
 
 
 16
 Third, Defendants contend that the evidence failed to support a finding of a scheme to defraud, because the consumer could have confirmed (or disproved) any representation made by Legendary Concepts from readily available external sources. See, e.g., Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co., 941 F.2d 561, 570-71 (7th Cir. 1991) (holding, in a RICO action, that there was no scheme to defraud when the plaintiffs could have verified the veracity of the allegedly fraudulent statements in newspapers); Blount Fin. Servs., Inc. v. Walter E. Heller & Co., 819 F.2d 151, 153 (6th Cir. 1987) (holding, in a RICO action, that there was no scheme to defraud when the plaintiff could have "verified . . . independently" the alleged misrepresentations). In other words, Defendants maintain that there can be no criminal liability for fraud when the veracity of an allegedly fraudulent statement may be checked easily through an independent source. This court has not yet considered whether the "independent source" rule proposed by Defendants is consistent with the law of this circuit.[2] However, we need not consider that question here because, even if we were to apply the proposed rule, Defendants could not prevail.
 
 
 17
 There is nothing in the record showing that Legendary Concepts provided to its customers the type of information that would have enabled them to "comparison shop " as a means of discovering the actual value of its prizes and merchandise. In fact, the opposite is true. Legendary Concepts' sales personnel often described the "gimme" prizes in nonspecific terms to conceal their actual value. For example, telemarketers would not disclose that the "limited edition artwork" was a mass-produced lithograph, instead of an original, unique work. Similarly, they would notdescribe the make and model of "prizes" such as the "complete" stereo system. Even when asked specifically about the value of the prizes, telemarketers refused to provide the information to customers, citing the company's policy against such disclosures.
 
 
 18
 Furthermore, the authorities cited by Defendants are easily distinguishable. For instance, both Adolescent Psychiatry and Blount involved allegedly misleading statements about interest rates, information that is readily available in most newspapers. By contrast, Defendants' suggestion that customers, who were located throughout the nation, could have called gift shops at NASA or Disney World in Florida to verify the market price of Fisher "space" pens is plainly more difficult and costly.
 
 B. Sufficiency of the Evidence
 
 19
 Defendants next contend that, even if their interpretations of the controlling law are incorrect, their convictions must be reversed, because the government failed to produce sufficient evidence to support the jury's verdicts. We disagree.
 
 
 20
 There is ample evidence in the record from which a reasonable jury could have concluded that each Defendant participated in a scheme to defraud and used the interstate wires in furtherance of that scheme. Hanley, Moore, and Scott owned, operated, and managed every aspect of Legendary Concepts, a telemarketing company that made false and misleading representations to customers. Perhaps the most glaring example of Defendants' deception was the manner in which the company selected prizes for its customers. Although Legendary Concepts' sales personnel informed customers that the prizes were selected randomly, in reality customers always "won" the "gimme gift." On that once-a-year occasion when Legendary Concepts actually awarded valuable prizes to its customers, the winners were handpicked either by employees under the direction of Defendants, or by Defendants themselves, not by the random process described to customers. Defendants' claims that they were innocent bystanders who were unaware that their telemarketers were making false sales pitches simply cannot withstand scrutiny.
 
 
 21
 There also was ample evidence to support defendant Fry's convictions. Fry was one of the most accomplished salespeople at Legendary Concepts. He trained other sales staffers and was a "takeover man," who joined the phone calls of less-experienced staffers to consummate sales. The fraudulent nature of Fry's sales pitch was manifest. For example, he suggested to one customer that the "valuable" piece of artwork might be worth somewhere "in the ball park " of $50,000, and deceived that same customer about the value of the Fisher "space" pens. From the foregoing evidence, a reasonable jury could have concluded that Fry was guilty of wire fraud and conspiracy to commit wire fraud.
 
 II. MONEY-LAUNDERING COUNTS
 
 22
 Next, Hanley, Moore, and Scott attack the legal and factual basis of their convictions for money laundering under 18 U.S.C. S 1957. Defendants rely on this court's recent decision in United States v. Rutgard, 116 F.3d 1270 (9th Cir. 1997). Defendants maintain that Rutgard requires the government to trace each of the allegedly illegal monetary transactions to criminally derived proceeds and that the government failed to do so at trial. The government concedes that it did not trace funds. Instead, the government argues that, under Rutgard, tracing is not required when the government proves that the monetary transfers generally involved fraudulently procured funds. We affirm Defendants' convictions for money laundering, but not on the ground advanced by the government on appeal.
 
 
 23
 Section 1957 punishes, by up to 10 years' imprisonment and a fine, anyone who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. S 1957.(a). In Rutgard,this court outlined the ways in which the prosecution could and could not prove a violation of that statute. There, the government had charged the defendant, an ophthalmologist, with two counts of money laundering in violation of S 1957, for allegedly having transferred more than $7.5 million in criminally derived funds from his bank account. Although the government asserted that the defendant's entire medical practice was fraudulent, this court rejected that theory, on the facts, noting that the proof showed only that the defendant had derived $46,000 of the $7.5 million by fraudulent means.
 
 
 24
 Thus, this court determined that, at the time of the transfers, the defendant's bank account contained funds from both legal and illegal sources. See Rutgard, 116 F.3d at 1290. The court then addressed whether there was sufficient evidence to establish that the defendant had transferred at least $20,000 of the "fruits of the fraud" ($10,000 for each count) as part of the $7.5 million transfer from his account. The court held that there was not. Because there remained more than $46,000 in the defendant's bank account on the date of the allegedly illegal transfers, the government had not proved beyond a reasonable doubt that the $7.5 million transfer included the criminally derived funds. See id. at 1291-93.
 
 
 25
 In reaching that decision, this court observed that, other than by tracing funds, there existed a limited number of methods of proving a violation of S 1957. First, the government could show that the defendant's entire business was a fraud, a theory that was rejected under the particular facts of Rutgard. See id. at 1290 (stating that, if the government had succeeded in proving that the defendant's whole practice was a fraud, then the defendant properly could have been convicted of money laundering). Second, the government could prove a violation by "show[ing] only a single $10,000 deposit of criminally-derived proceeds." Id. at 1292 (emphasis added). Third, the government could satisfy its burden of proof by establishing that the defendant had transferred all the funds out of his account. See id. ("Commingling with innocent funds can defeat application of the statute to a withdrawal of less than the total funds in the account."). Finally, this court rejected the use of a fourth method of proof, adopted by some circuits, that the depositing of any criminally derived funds in an account creates a presumption that those funds are involved in a subsequent transfer from the account. See id. at 1293 (stating that adopting such a rule "would be an essay in judicial lawmaking, not an application of the statute").
 
 
 26
 Turning now to the facts of this case, the indictment alleged that, from January 6, 1994, to March 15, 1995, Defendants had made 17 illegal monetary transfers, each in excess of $10,000, from two of the company's bank accounts at Charter Pacific Bank to a single bank account at Bank of America. The government's proof at trial established that the accounts at Charter Pacific Bank were "merchant accounts, " that is, accounts in which a company receives its revenue from credit card sales. The Bank of America account was a "business account," that is, an account from which a company pays its operating expenses. The government's financial analyst testified that 80.5 percent of the funds in the first Charter Pacificaccount and 86.6 percent of the second Charter Pacific account came from credit card deposits.
 
 
 27
 The government now contends that, under Rutgard, it was not required to trace the 17 transactions to criminally derived proceeds, because "the great majority of the funds in the Charter Pacific account[s] consisted of fraudulent telemarketing proceeds." (Emphasis added.) The government misreads Rutgard. Rutgard states that "the government may prevail by showing that all the funds in the account are the proceeds of crime." 116 F.3d at 1292 (emphasis added). Here, the government did not prove that, on the dates of the transactions, all the funds in the particular Charter Pacific account were criminally derived. The government establishedonly that the accounts consisted primarily of credit card deposits from Legendary Concepts' customers. The record does not show that Defendants secured every deposit through illegal means. That is the type of specific proof -or tracing of criminally derived funds -generally required under Rutgard.
 
 
 28
 A reasonable jury, however, could have convicted Defendants of money laundering on an alternative ground advanced by the government at trial: that Legendary Concepts in its entirety was a fraudulent enterprise. Rutgard permits such a method of proof, see id. at 1290 ("If the government had succeeded in [the theory that all of the defendant's practice was a fraud], it would have properly convicted him of the monetary transaction counts."), and the district court so instructed the jury.[3] As discussed, the proof at trial painted a picture of a company whose only purpose was to sell exorbitantly overpriced products to unwitting customers through means of deceit, misrepresentations, and half-truths. The government also demonstrated at trial that the only funds in the Charter Pacific accounts came from Legendary Concepts' sales activities. There was no evidence to suggest that the accounts contained funds from nonbusiness-related sources. Thus, under the theory that Legendary Concepts was a fraudulent enterprise in its entirety, a reasonable jury properly could have convicted Defendants of money laundering under S 1957.
 
 
 29
 At oral argument, Defendants argued that there was insufficient evidence to prove that Legendary Concepts was a fraudulent enterprise in its entirety, because there was testimony from a former Legendary Concepts employee, Ron Thomas, that the company had operated lawfully and that he personally never had deviated from the sales pitch, whereas the jury found (in accordance with the indictment) that Defendants began their conspiracy four months after the company's incorporation. Defendants' assertion misses the mark. The sufficiency of the evidence is not judged by whether there is some testimony that is contrary to the jury's verdict. A conflict in the evidence does not necessarily undermine the validity of a conviction. Here, the record as a whole demonstrates that a reasonable jury could find that Defendants operated a wholly fraudulent enterprise during the period charged in the indictment.
 
 
 30
 Finally, Defendants contend that the monetary transfers listed in the indictment did not involve "criminally derived property," because the money transferred from customers of Legendary Concepts into the Charter Pacific Bank accounts were not proceeds of the wire fraud until the funds were credited to those accounts. However, at trial, Defendants stipulated that they had caused the 17 monetary transactions listed in the indictment. Thus, they conceded that the Charter Pacific Bank accounts contained the challenged funds andthat they then transferred those funds to an account at Bank of America on the specified dates. As discussed, those transactions constituted monetary transfers of "criminally derived property" under S 1957. Cf. United States v. Savage, 67 F.3d 1435, 1443 (9th Cir. 1995) (holding that "the funds trans-ferred in the S 1957 counts were criminally derived property at the time they were deposited in accounts under[the defendant's] control").
 
 III. DEFENDANT FRY'S MOTION FOR SEVERANCE
 
 31
 Before trial, Fry moved for severance on the ground that he would not receive a fair trial if he were tried with the three owners of Legendary Concepts, each of whom had been charged with more offenses than Fry. The district court denied the motion. Fry now challenges that ruling, arguing that the "utter disparity in both quantity and type of evidence adduced at trial against the three co-defendants compared to that which was presented against" him was unfairly prejudicial. Fry also argues that severance became necessary after the start of trial, because his defense became mutually antagonistic to that of defendant Scott. We review the district court's denial of a criminal defendant's motion to sever for an abuse of discretion. See United States v. Mayfield, 189 F.3d 895, 898-99 (9th Cir. 1999).
 
 
 32
 A criminal defendant who seeks reversal of a trial court's denial of a motion to sever bears a "heavy burden." See United States v. Cruz, 127 F.3d 791, 798 (9th Cir. 1997), cert. denied, 118 S. Ct. 896 (1998). "The test for abuse of discretion by the district court is whether the joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in just one way, by ordering a separate trial." Mayfield, 189 F.3d at 899 (citation and internal quotation marks omitted). Additionally, we have held that "the risk of prejudice posed by joint trials can be cured by proper jury instructions." United States v. Nelson, 137 F.3d 1094, 1108 (9th Cir.), cert. denied, 119 S. Ct. 2 (1998). A defendant "seeking severance based on the `spillover' effect of evidence admitted against a co-defendant must also demonstrate the insufficiency of limiting instructions given by the judge." Id. (citation and internal quotation marks omitted).
 
 
 33
 With respect to the "disparity " claim, Fry fails to demonstrate with sufficient particularity how he suffered prejudice from the joint trial. See United States v. Baker, 10 F.3d 1374, 1389 (9th Cir. 1993) (holding that broad and general allegations of prejudice are insufficient to demonstrate an abuse of discretion). The facts that Fry's name arose somewhat less often during the trial and that he was charged with fewer offenses are not enough. Rather, he must demonstrate that the joint trial impinged on a fundamental trial right or compromised the fairness of the proceedings in a tangible way. See Cruz, 127 F.3d at 798 (holding that severance is required "only if a serious risk exists that a joint trial would compromise a particular trial right of a properly joined defendant or prevent the jury from reliably determining guilt or innocence"); Baker, 10 F.3d at 1388 ("It is not enough for [the defendants] to show that separate trials would have created a better chance for acquittal."). This he has failed to do.
 
 
 34
 Moreover, any risk of prejudice was cured by proper instructions. The district court instructed the jury that "[e]ach alleged offense, and the evidence pertaining to it, should be considered separately by the jury" as to each Defendant. The district court further instructed that "[i]t is your duty to give separate, personal consideration to the case of each individual defendant" and that whether "you may find one defendant guilty or not guilty of one of the offenses charged should not control your verdict as to any other offense charged against that defendant or any other defendant." Fry has not argued that those instructions were inadequate. Further, we must presume that the jury followed the district court's clear instructions.See Wade v. Calderon, 29 F.3d 1312, 11 (9th Cir. 1994). On Fry's "disparity" claim, we conclude that the joint trial did not deprive Fry of his right to a fair trial.
 
 
 35
 Fry's claim of mutually antagonistic defenses is equally unavailing. A criminal defendant is entitled to a separate trial on the ground of mutually antagonistic defenses only if "the core of the co-defendant's defense is so irreconcilable with the core of his own defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the defendant." Mayfield, 189 F.3d at 899 (citation and internal quotation marks omitted). Fry asserts that his position throughout the trial was that, because the State of Nevada had approved the pitch sheet used by Legendary Concepts' telemarketers, the pitch sheet could not have contained false or misleading information. He claims that his defense became antagonistic to that of defendant Scott when Scott's counsel elicited testimony on cross-examination from Kerry Bilyeu, a former manager at Legendary Concepts, that the pitch sheet contained lies and was misleading.
 
 
 36
 Fry's argument is unpersuasive for two reasons. First, he mischaracterizes his co-defendant's defense. Scott's defense was not that the pitch sheet contained lies. To the contrary, during closing arguments, Scott's counsel asserted that Legendary Concepts was not a fraudulent enterprise and, more specifically, that the state-approved pitch sheet was truthful. For example, counsel stated: "Another interesting sales witness was Ron Thomas . . . . He stated that he never misrepresented, and he always stuck to the sales pitch . . . . The government had his pitch. And that would mean that the pitch provided by Legendary Concepts was not fraudulent in any way if the salesman stuck to it."
 
 
 37
 Furthermore, even if Scott had adopted the defense that Fry suggests, the two defenses at their cores were not irreconcilable. See Cruz, 127 F.3d at 800. The jury could have concluded that the pitch sheet contained lies, yet still have determined that defendant Fry was not guilty, on the ground that his good-faith reliance on the state-approved pitch sheet negated any intent to defraud.
 
 
 38
 In summary, the district court did not abuse its discretion by refusing to grant defendant Fry's motion for a separate trial.
 
 IV. EVIDENTIARY RULINGS
 
 39
 Next, Defendants challenge several of the district court's evidentiary rulings, each of which we review for an abuse of discretion. See United States v. Ramirez, 176 F.3d 1179, 1182 (9th Cir. 1999) (stating that standard of review). Reversal for an abuse of discretion is required "only if such nonconstitutional error more likely than not affected the verdict." Id. (citation and internal quotation marks omitted).
 
 
 40
 Defendants first contend that the district court erred in limiting the scope of their cross-examination of Karen Stepanoff, a member of the American Association of Retired Persons, who had volunteered to assist the FBI in its investigations of telemarketing fraud by receiving and recording unsolicited telephone calls from telemarketers. Stepanoff testified about a call that she had received from defendant Fry. On cross-examination, the district court sustained the government's objection to the question: "If you had been instructed by the FBI agent would you have called back and asked to speak to any particular individual?" Defendants assert that the district court's ruling was erroneous and prejudicial, because it prevented them from exploring the scope of the government's investigation and showing that further investigation might have led to exculpatory evidence. We disagree. The question posed to Stepanoff was of limited relevance. Although Defendants maintain that they were denied the opportunity to develop a theory of lack of government investigation, they point to no other portions of the record wherethey pursued such a defense. Moreover, Defendants' assertion that further investigation would have resulted in exculpatory evidence is purely speculative.
 
 
 41
 Second, Defendants argue that the district court failed to enforce its own pre-trial in limine order, which prohibited the government from introducing evidence that Defendants' scheme specifically had targeted the elderly.[4] The district court reasoned that such an order was necessary to avoid the risk of "tainting the issue of Defendant's guilt or innocence with the suggestion that their alleged crime is the more heinous for having been deliberately aimed at the elderly." In their opening briefs, defendants Moore and Scott describe numerous instances in which the government allegedly violated the pre-trial order. As a threshold matter, in the vast majority of those instances, Defendants failed to object to the testimony on the ground that they now advance.[5] Accordingly, we review the admission of that evidence for plain error. See United States v. Houser, 804 F.2d 565, 570 (9th Cir. 1986) (holding that a challenge to a trial court's admission of evidence "cannot be raised on appeal if no contemporaneous objection was made at trial unless plain error is shown"). Here, there was no error. The testimony to which Defendants failed to object at trial involved background information about the government's witnesses. "It is not improper for the government to elicit background information from a witness." United States v. Croft, 124 F.3d 1109, 1120 (9th Cir. 1997). At no time did the government violate the in limine order by using the background evidence to argue that Legendary Concepts targeted the elderly.
 
 
 42
 Defendants also challenge the admission of other testimony, as to which they made timely objections: (1) the testimony of Sandra Kearney, a consumer fraud investigator, who stated that she had posed as an "elderly Iowan who had lost most of her life savings"; (2) the testimony (on redirect examination) of FBI Agent Stewart Roberts, who stated that the elderly typically are targets of the "premium promotion" industry; and (3) the testimony of Chris Baird and Kerry Bilyeu, both of whom stated that the customers whom they had called were "lonely" people.
 
 
 43
 In none of the foregoing instances did the district court err in allowing the challenged testimony. First, Kearney's testimony merely provided background information about the identity that she had assumed in her job as a consumer fraud investigator for the State of Iowa. That information was relevant to understanding how Kearney had come to receive a call from Legendary Concepts.
 
 
 44
 The challenged testimony of Roberts arguably violated the district court's pre-trial order. However, the district court, within the bounds of its discretion, properly ruled that defendant Hanley's counsel had "opened the door" on cross examination when he asked: "And if as an owner I learned that there were individuals cold calling persons and some of them happened to be elderly persons, would there be anything illegal or inappropriate about that?" (Emphasis added.) Thatquestion "opened the door" to the prosecution to inquire about the targeting of elderly victims -how many are "some" and did they just "happen[ ] to be elderly."
 
 
 45
 As to the testimony of Baird and Bilyeu, their statements that they had called "lonely" people did not relate directly to the elderly. Young people can be lonely, too. Their testimony therefore did not violate the district court's pre-trial order.
 
 
 46
 Defendants' last claim of evidentiary error is that the district court improperly allowed the government's cooperating witnesses to testify. They reason that the government's offers of leniency in exchange for the witnesses' testimony violated 18 U.S.C. S 201(c)(2). Because Defendants failed to raise this issue before the district court, we review for plain error. See United States v. Baron, 94 F.3d 1312, 1316 (9th Cir. 1996). The district court did not err. This court now has held that the government's promise of leniency to a witness does not violate 18 U.S.C. S 201(c)(2). See United States v. Mattarolo, No. 98-10395, slip op. at 9947 (9th Cir. Aug. 27, 1999); see also United States v. Flores, 172 F.3d 695, 699-700 (9th Cir. 1999) (holding that permitting cooperating government witnesses to testify did not constitute plain error because, at the time of the defendant's trial, "no court had ever excluded evidence on the ground that the government violated section 201(c)(2)"), petition for cert. filed, (U.S. June 28, 1999) (No. 99-5111).
 
 V. JUROR-RELATED ISSUES
 
 47
 Next, Defendants raise two arguments regarding the behavior of members of the jury. First, Defendants maintain that they were entitled to new trials, because the district court failed to remove a juror who allegedly had made comments during trial revealing her bias against Defendants. Second, Defendants assert that the district court should have granted their post-trial motion for a new trial on the asserted ground that several jurors had coerced a lone holdout juror to vote "guilty" by threatening him with criminal prosecution. Neither argument persuades us.
 
 A. The Comments of Juror No. 4
 
 48
 During the trial, defense counsel received a note from Juror No. 8, reporting that Juror No. 4 had been making comments throughout the course of trial, such as "good " and "leave him alone," in response to questioning. On the basis of that note, Defendants moved for the dismissal of Juror No. 4. Without holding an evidentiary hearing, the district court denied the motion, reasoning that the alleged comments were too vague to draw a conclusion that Juror No. 4 was biased. Defendants now argue that the district court erred by refusing to remove Juror No. 4 and by ruling on the motion without holding an evidentiary hearing.
 
 
 49
 This court reviews "for manifest error a court's findings regarding juror impartiality." United States v. PadillaMendoza, 157 F.3d 730, 733 (9th Cir. 1998), cert. denied, 119 S. Ct. 1084 (1999). A defendant bears the burden of showing that a juror "was actually biased" against him or her "and that the district court abused its discretion or committed manifest error when it failed to excuse [the juror] for cause." United States v. Alexander, 48 F.3d 1477, 1484 (9th Cir. 1995).
 
 
 50
 The district court did not abuse its discretion in declining to remove Juror No. 4. In the circumstances, comments such as "good" and "leave him alone" were too vague to establish that Juror No. 4 actually was biased against Defendants. Cf. United States v. Sears, 663 F.2d 896, 899-900 (9th Cir. 1981) (holding that the trial court did not abuse its discretion when it refused to remove a juror who had said "nice job" to an FBI agent, when the juror had explained that he intended the comment only to compliment the agent for speaking loudly). Thus, allowing Juror No. 4 to remain on the jury panel did not amount to a deprivation of Defendants'Fifth Amendment right to due process or their Sixth Amendment right to an impartial jury. See id. at 900 (stating that the proper inquiry is whether juror bias rises to the level of a constitutional deprivation).
 
 
 51
 Further, we are not persuaded that the district court had to hold an evidentiary hearing before ruling."An evidentiary hearing is not mandated every time there is an allegation of jury misconduct or bias. Rather, in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source." United States v. Angulo, 4 F.3d 843, 847 (9th Cir. 1993) (citations omitted) (emphasis in original). Here, the district court did what it was required to do. It considered the content and the seriousness of the alleged statements and properly determined that such vague statements did not expose Defendants to unfair prejudice. In the circumstances, the district court's refusal to hold an evidentiary hearing was not an abuse of discretion.
 
 B. Juror Misconduct Involving Holdout Juror
 
 52
 After the close of trial, the district court received information from defense counsel alleging that certain jurors improperly had influenced the decision-making of a lone holdout juror. In an affidavit submitted to the trial court, the holdout averred that certain jurors had coerced him by threatening to notify Nevada authorities that his car did not bear Nevada license plates. After holding a two-day evidentiary hearing, the district court denied Defendants' motion for a new trial. In so holding, the district court made the following findings of fact:
 
 
 53
 During the jury deliberations on Friday, April 25, 1997, Juror [C] said to [the holdout] something to the effect: "Why do you have Oklahoma license plates on your vehicle?" [The holdout] responded that it was cheaper to get insurance. Another juror, probably Juror [G], said that it was unfair for [the holdout] to have out-of-state plates.
 
 
 54
 The court finds that that is all that was said during the jury deliberations about the fact that [the holdout] had out-of-state license plates. The court finds that these were the only credible statements made during jury deliberations concerning [the holdout's] out-of-state license plates. There were no other statements. There was no threat. . . . [E]xcept to the extent that [the holdout's] testimony is consistent with the above findings of fact, we discount his testimony in this regard as being discredited and incredible.
 
 
 55
 (Emphasis added.)
 
 
 56
 We review the district court's denial of a motion for a new trial on the asserted ground of juror misconduct for an abuse of discretion. See United States v. LaFleur, 971 F.2d 200, 206 (9th Cir. 1992). "[A]lthough we review alleged incidents of juror misconduct independently, we must accord special deference to the trial judge's impression of the impact " of the alleged misconduct. United States v. Plunk, 153 F.3d 1011, 1024 (9th Cir.), amended by, 161 F.3d 1195 (9th Cir. 1998), cert. denied, 119 S. Ct. 1376 (1999). We review the district court's credibility determinations and findings of historical fact for clear error. See United States v. Oba , 978 F.2d 1123, 1125 (9th Cir. 1992).
 
 
 57
 This court has held that "[r]eviewing courts will not disturb jury verdicts on appeal when extraneous information relates only to issues not material to the guilt or innocence of the defendant. And intrinsic jury processes will not be examined on appeal and cannot support reversal." United States v. Bagnariol, 665 F.2d 877, 887 (9th Cir. 1981). On this record, it was reasonable for the district court to conclude that the remarks made to the holdout juror about his out-of-state license plates did not rise to the level of "extraneous information" that related to the "guilt or innocence" of Defendants. We have conducted an independent review of the record and conclude that the districtcourt's findings of fact and credibility determinations were not clearly erroneous, and its denial of Defendants' motion for retrial did not constitute an abuse of discretion.
 
 VI. SENTENCING ISSUES
 
 58
 A. The District Court's Guideline Calculations
 
 
 59
 Before addressing the various sentencing issues raised by defendants Hanley, Moore, and Scott, we summarize briefly how the district court arrived at their respective sentences.
 
 1. Defendant Hanley
 
 60
 The district court ruled that it would not group Defendants' convictions for wire fraud and money laundering. See generally U.S.S.G. S 3D1.1-4 (rules governing grouping of related offenses). On the basis of that ruling, the district court began calculating Hanley's offense levels as follows:
 
 
 61
 Money Laundering:
 1. Base Offense Level under U.S.S.G. S 2S1.2(a): 17
 2. Specific Offense Characteristics
 a. Other Specified Unlawful Activity 2
 b. Value of the Funds -determined to be more than $10
 million but less than $20 million,
 see U.S.S.G. S 2S1.1(b)(2): 9
 c. Aggravating role in the offense
 organizer or leader,
 see U.S.S.G.S 3B1.1(a) 4
Total: 32
Wire Fraud:
1. Base Offense Level under
 U.S.S.G. S 2F1.1(a): 6
2. Specific Offense Characteristics
 a. Loss -determined to be more
 than $10 million but less than
 $20 million: see U.S.S.G.
 S 2F1.1(b)(1) 17
 b. More than minimal planning
 or a scheme to defraud more
 than one victim, see U.S.S.G.
 S 2F1.1(b)(2) 2
 c. Role in the offense-organizer
 or leader, see U.S.S.G.
 S 3B1.1(a) 4
Total: 27
 
 
 62
 The district court then held that, under United States v. Calozza, 125 F.3d 687 (9th Cir. 1997), it had to subtract the 4-level role-in-the-offense adjustment from the group with the lower offense level, the wire-fraud group, to avoid the problem of double-counting. See id. at 691-92 (holding that, to avoid the problem of double-counting under U.S.S.G. S 3D1.4, the vulnerable-victim adjustment could be applied only once).[6] That calculation reduced the offense level of the wire-fraud group to 23.
 
 
 63
 Next, the district court calculated Hanley's combined -and final -offense level under U.S.S.G. S 3D1.4. Applying that rule, the district court "disregarded" the wire-fraud group and added no additional offense levels to the most serious offense group, the money-laundering group, because the difference between defendant Hanley's highand low-offense groups equaled 9 levels (32 levels minus 23 levels). See U.S.S.G. S 3D1.4(c) ("Disregard any Group that is 9 or more levels less serious than the Group with the highest offense level.") (boldface type in original). Thus, defendant Hanley's final offense level equaled the offense level for the money laundering group, 32.
 
 2. Defendants Moore and Scott
 
 64
 The district court calculated the offense level for Moore and Scott in precisely the same way as Hanley's, with one exception. Instead of assessing a 4-level role-in-the-offense adjustment under S 3B1.1, the district court assessed a 3-level adjustment for managing or supervising a criminal activity. See U.S.S.G. S 3B1.1(b). Thus, Moore's and Scott's offense level for money laundering was 31 and their offense level for wire fraud was 23 (after subtracting 3 levels to avoid double counting under the Calozza principle).
 
 
 65
 Nevertheless, Moore and Scott ended up with the same combined offense level, 32, as Hanley. This is why: Applying S 3D1.4, the difference between Moore's and Scott's highand low-offense groups was 8 levels (31 levels minus 23 levels). Under S 3D1.4, an 8-level differential counts as one half unit for the purpose of calculating the combined offense level. See S 3D1.4(b) ("Count as one-half Unit any Group that is 5 to 8 levels less serious than the Group with the highest offense level.") (boldface type in original). That rule also provides that the highest offense level group itself counts as 1 unit. See U.S.S.G. S 3D1.4(a). Thus, Moore and Scott had a total of 1-1/2 units. On the basis of that total,S 3D1.4 requires the trial court to add 1 level to the highest offense group. In this case, the highest offense group was the money-laundering group, which had an offense level of 31. By adding an additional 1 level to that group, Moore and Scott's resulting combined offense level increased to, the same offense level received by Hanley.
 
 B. Grouping
 
 66
 Defendants argue that the district court erred by refusing to group the wire-fraud and money-laundering counts under U.S.S.G. S 3D1.2(d). We examine de novo the district court's refusal to group offenses under the Sentencing Guidelines. See United States v. Lopez, 104 F.3d 1149, 1150 (9th Cir. 1997).
 
 
 67
 Defendants' argument is foreclosed by this court's decision in United States v. Taylor, 984 F.2d 298, 303 (9th Cir. 1993), which held that, because "the guidelines for wire fraud and money laundering measure harm differently[,] .. . the dismissed wire fraud count cannot be grouped with the monetary transaction count under section 3D1.2(d)." Recognizing the straightforward application of Taylor, Defendants instead rely on United States v. Rose, 20 F.3d 367 (9th Cir. 1994), for the proposition that, when there is a complete identity between the fraudulently obtained funds and the laundered funds, grouping is required. See id. at 372 (distinguishing Taylor on that ground that, "[w]hereas in Taylor the monies involved in the charge of conviction and related (and ultimately dismissed) charges merely overlapped and were thus not interchangeable, in the instant case these amounts were duplicative") (footnote omitted). Defendants contend that such a complete identity existed in this case, because all the monies deposited in the Pacific Charter accounts were laundered through the Bank of America account.
 
 
 68
 Even assuming, without deciding, that the foregoing factual assertion is supported by the record, Defendants' reading of Rose is too broad. Rose does not, as Defendants suggest, stand for the proposition that the "no grouping" rule of Taylor is inapplicable when there is complete identity between the fraudulently derived and the laundered funds. The holding of Rose is far more narrow.
 
 
 69
 In that case, the district court had grouped the defendant's money-laundering and wire-fraud counts. On appeal, this court affirmed the district court's calculation of the offense level, but not on the ground of grouping. Rather, the court held that, because there was a complete identity between the laundered and the fraudulently derived funds, the amount of the fraudulently derived funds could be treated as "relevant conduct," akin to uncharged counts of money laundering, for purposes of calculating the "value of funds" under S 2S1.1. See id. at 372-73 (holding that the "designation of uncharged money laundering counts as relevant conduct permits the `value of the funds' for sentencing purposes to encompass virtually all of the funds" obtained through fraudulent means, "regardless of whether such monies were also subject to the wire fraud counts"). The court stated that such treatment was not available in cases such as Taylor because, "[i]nsofar as only partial identity existed between the funds laundered and the monies wired . . . , the Government could not recharacterize all the latter funds as the former to takeadvantage of the steeper sentencing schedule for money laundering under U.S.S.G. S 2S1.1." Id. at 372. Thus, Rose permits trial courts to treat fraudulently derived funds as "relevant conduct" for sentencing purposes under S 2S1.1 only when such funds are co-extensive with the sums involved in money laundering. Rose does not require grouping in those circumstances. Accordingly, the district court did not err by refusing to group Defendants' wire-fraud and money-laundering counts.
 
 C. The Role-in-the-Offense Adjustment
 
 70
 Defendant Hanley makes two arguments with respect to the district court's application of the role-in-the-offense adjustment. First, he claims that the district court improperly applied the 4-level increase to the money-laundering group. Second, he contends that, if that adjustment applies, he should have received the same 3-level increase given to his codefendants, Moore and Scott. We review a district court's determination that a defendant was an "organizer or leader" for clear error. See United States v. Ponce, 51 F.3d 820, 826 (9th Cir. 1995).
 
 
 71
 This court answered Hanley's first argument in Savage, 67 F.3d at 1443-44. There, the defendant similarly asserted that the district court properly applied the role-in-the-offense adjustment to his fraud convictions, but not to his money laundering convictions. This court rejected the defendant's argument, holding that the defendant's "role in the entire mail and wire fraud scheme is relevant conduct for purposes of determining his aggravating role in money laundering." Id. at 1443. Likewise, here, the district court properly considered Hanley's role in the entire wire-fraud scheme in determining that he should receive a 4-level increase for his role in the money-laundering scheme.
 
 
 72
 We need not address Hanley's second argument: that he should have received the same 3-level adjustment for his role in the offense as his co-defendants received. As explained above, even if defendant Hanley had received the same 3level adjustment as his co-defendants, his resulting offense level would have been 32, the same offense level that he received with a 4-level adjustment. That is, even if the district court improperly applied the role-in-the-offense adjustment to Hanley, that error had no effect on the sentence that he received.
 
 
 73
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Lemon involved a conviction for mail fraud, not wire fraud. However, this court has held that cases interpreting the mail-fraud statute are relevant to interpreting the wire-fraud statute. See United States v. Lewis, 67 F.3d 225, 233 n.12 (9th Cir. 1995).
 
 
 [2]
 Those circuits adopting an "independent source" rule also require that the fraudulent representation or omission be reasonably calculated to deceive persons of ordinary prudence and comprehension. See, e.g., Adolescent Psychiatry, 941 F.2d at 570 (stating that rule); Blount, 819 F.2d at 153 (same). As noted, there is no such "reasonable consumer" requirement in this circuit.
 
 
 [3]
 Much to its credit, the district court properly instructed the jury regarding the methods of proving money laundering under Rutgard. The jury instruction provided:
 The government may prove that the funds withdrawn or transferred from the Charter Pacific Bank account, as detailed in the indictment, are criminally derived in any of three ways:
 First, the government may prove that all the money in the account came from Legendary Concepts' activities, and that Legendary Concepts was an entirely fraudulent enterprise; or
 Second, the government may prove that all the money in the account, at the time a particular withdrawal or transfer was made, was criminally derived; or
 Third, the government may prove that the amount of a particular withdrawal or transfer exceeded the total of all non-criminally derived funds in the account just prior to the withdrawal. For example, if the account contained $100,000, of which half was criminally derived and half was not, any withdrawal of less than half of the funds in the account -that is, of less than $50,000 -would not involve criminally derived property. In this third situation, remember that the government must prove that the withdrawal or transfer included at least $10,000 of criminally derived funds.
 (Underscoring in original.)
 
 
 [4]
 Defendant Hanley joined in this argument for the first time in his reply brief. Although this court ordinarily will not review issues raised for the first time in a reply brief, we allow Hanley to join the argument of his codefendants, because the issue is not defendant-specific and the government will suffer no resulting prejudice from our decision, as it has briefed the issue thoroughly. See United States v. Ullah, 976 F.2d 509, 514 (9th Cir.1992) (stating that "we may review an issue if the failure to raise the issue properly did not prejudice the defense of the opposing party").
 
 
 [5]
 Defendants failed to raise timely objections with respect to the testimony of the following witnesses: Arthur Shierman, Beulah May James, Dolores Cerinni, Henry Dearsman, Evelyn Lucille, Alvin Washburn, Lucille Adams, Alice Springer, Dora Malesta, Marilyn Wojcicki, Walter Harfmann, Willie Lovett, William Labelle, Gerald McSweeney, and Frank Arrandale.
 
 
 [6]
 On appeal, the government does not challenge the district court's calculation.